# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> PAMELA GOLINVEAUX, <br><br> Defendant. | No. 08-CR-2015-CJW-MAR <br><br> **MEMORANDUM OPINION AND ORDER** |

## I.     INTRODUCTION

This matter is before the Court on defendant's Motion for Compassionate Release filed on June 11, 2020.  (Docs. 78 & 79).  On June 18, 2020, the government timely filed a brief in resistance.  (Doc. 81).  On June 23, 2020, defendant timely filed a reply.  (Doc. 85).  Oral argument was not requested and is not necessary.  *See* LR 7(c).  For the following reasons, the Court **denies** defendant's motion.

## II.     RELEVANT BACKGROUND

On March 12, 2004, defendant was arrested for shoplifting three boxes of Sudafed tablets from a Wal-Mart in Cedar Falls, Iowa.  (Doc. 44, at 5).  Defendant told officers she intended to give the stolen Sudafed tablets to a methamphetamine manufacturer in exchange for methamphetamine.  (*Id.*, at 6).  During her arrest at the Wal-Mart, defendant consented to a search of her vehicle in the parking lot.  (*Id.*).  Inside the vehicle, officers discovered "a black tin that contained methamphetamine, a gold pipe that contained marijuana residue, a mirror, a syringe with blood, and a snort tube" as well as a revolver inside a cloth Crown Royal bag under the driver's seat.  (*Id.*).  The revolver was loaded with seven rounds of long rifle rimfire ammunition.  (*Id.*).  A third party that

was with defendant at the Wal-Mart advised officers that defendant kept the firearm in her vehicle in case "things were ever to 'go bad.'" (*Id.*, at 5, 7).

Defendant was charged in the Iowa District Court for Black Hawk County and convicted of theft in the third degree, possession of methamphetamine, and possession of drug paraphernalia. (*Id.*, at 27). On October 24, 2005, defendant received a two-year suspended prison sentence on her theft conviction with shorter suspended jail sentences on her other convictions running concurrently. (*Id.*). On January 11, 2007, the Court revoked her probation and imposed her suspended sentences because defendant failed to attend court-mandated appointments, was discharged from drug treatment due to excessive absence, tested positive for cocaine four times, and committed three new offenses (possession of cocaine, driving while license revoked, and possession of drug paraphernalia). (*Id.*, at 27–28). On May 23, 2007, defendant was paroled. (*Id.*). On December 9, 2007, defendant was discharged from prison. (*Id.*).

On August 26, 2008, a grand jury issued an Indictment charging defendant with one count of felon in possession of ammunition as an armed career criminal in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e)(1) in relation to her conduct on March 12, 2004. (Doc. 1). On September 15, 2008, officers arrested defendant. (Doc. 11). That same day, defendant appeared before the Honorable Linda R. Reade, United States District Court Judge, pleaded not guilty, and was detained pending trial. (Doc. 5). On October 31, 2008, defendant appeared before the Honorable Jon S. Scoles, United States Magistrate Judge, and entered a conditional guilty plea which reserved her right to appeal the Court's denial of her motion to suppress. (Docs. 34 & 35). On November 17, 2008, the Court accepted defendant's guilty plea. (Doc. 40).

On February 19, 2009, the United States Probation Officer ("USPO") filed defendant's final presentence investigation report ("PSR"). (Doc. 44). Defendant, at that time, was 55 years old and residing in Waterloo, Iowa, where she was also born.

(*Id.*, at 2, 38). Defendant graduated high school. (*Id.*, at 2). Defendant reported having a good upbringing as an only-child with attentive parents, although she did note her mother was an alcoholic and her parents later divorced. (*Id.*, at 38–39). Defendant had never married or had any children. (*Id.*, at 39). Defendant, except for about three years, was unemployed her entire life, which she attributed to her substance abuse issues. (*Id.*, at 50–51). Defendant's history of drug abuse—including marijuana, methamphetamine, cocaine, heroin, methadone, and more—was significant. (*Id.*, at 46–47). Defendant reported that, at times, she consumed 25 methadone tablets a day. (*Id.*, at 46). Defendant underwent multiple drug treatment programs and was diagnosed as chemically dependent on several drugs, including cocaine, marijuana, and amphetamines. (*Id.*, at 48–49).

Defendant's physical and mental health histories were turbulent. (*Id.*, at 40–42). In 1975, defendant fell off a balcony and fractured her right ankle. (*Id.*, at 40). Defendant later received various diagnoses related to her ankle, one of which found advanced degenerative changes and deformities due to improper healing of the fracture. (*Id.*). Defendant had osteoporosis and mild osteoarthritis and reported pain in her right ankle, right shoulder, and lower back. (*Id.*). Defendant reports she was later diagnosed with arthralgias, carpal tunnel, a heart murmur, hepatitis C, and liver disease. (*Id.*, at 41). Defendant had also received treatment for verrucous papules, probable sub-actinic keratosis, dysuria, chronic tonsillitis, abdominal pain, and gastroesophageal reflux disease. (*Id.*). As for mental health, defendant was treated for "depression, apathy, and extreme dependence on her social group." (*Id.*, at 42). Defendant was diagnosed with "[s]chizophrenic reaction, pseudoneurotic type." (*Id.*). After undergoing other long-term programs, defendant was diagnosed with major depressive disorder, antisocial personality disorder, and memory loss. (*Id.*, at 43). Later diagnoses included dysthymic disorder, attention deficient disorder, and personality disorder. (*Id.*, at 44). Defendant also attempted suicide at least three times and experienced suicidal ideation. (*Id.*, at 42,

44). By her own and others' assessments, much of her mental health problems revolved around her substance abuse. (*Id.*, at 44). Defendant also underwent ankle surgery and was diagnosed with arthritis, carpal tunnel, and possible osteoporosis. (*Id.*).

Defendant's criminal history, scoring 23 points and qualifying her as an armed career offender, was extensive. Defendant had some unspecified criminal conduct as a juvenile, including forging prescriptions for various controlled substances. (*Id.*, at 33). Defendant's most relevant convictions include: possession of marijuana at age 17; shoplifting at 19; breaking and entering a pharmacy at 23; obtaining prescription drugs by fraud and burglary of a pharmacy at 24; burglary of a pharmacy at 28; obtaining prescription drugs by fraud and unlawful use of a prescription at 31; armed robbery for taking $219 from a woman at gunpoint and aggravated battery for stabbing a police officer in his side and thigh with a knife also at 31; theft from a pharmacy and obtaining prescription drugs by fraud at 39; obtaining prescription drugs by fraud at 40; robbery for shoplifting two cartons of cigarettes from a Hy-Vee and spraying two employees in the face with tear gas in an attempt to escape at age 43; four thefts, three from grocery stores and another from a Baskin Robbins, also at 43; possession of marijuana and Xanax also at 43; the offense conduct at issue at 50; possession of marijuana at 51; criminal trespass for attempting to shoplift from a Wal-Mart she had been banned from also at 51; theft at 52; and possession of cocaine at 53. (*Id.*, at 11–34).[1] Her criminal history was replete with probation violations, violence, failures to comply with drug treatment, use of false identities, and flight from law enforcement officers. (*Id.*).

---

[1] Some of defendant's convictions characterized here as obtaining prescription drugs by fraud are listed as "prohibited acts" in the PSR. The offense conduct, however, shows defendant would pose as a nurse, order a prescription drug, and then appear at the pharmacy—sometimes in a disguise such as an eye patch—with a false name in an attempt to acquire the prescription drug. (Doc. 44, at 21–22).

On April 8, 2009, the Court sentenced defendant. (Doc. 49). The Court determined defendant was in criminal history category VI with a total offense level of 31, yielding an advisory guideline range of imprisonment of 188 to 235 months followed by three to five years on supervised release. (Doc. 44, at 52). The Court sentenced her to 188 months' imprisonment followed by five years on supervised release. (Docs. 49 & 50). On April 21, 2009, defendant timely appealed. (Doc. 52). On July 28, 2010, the Eighth Circuit Court of Appeals affirmed. (Doc. 68). Defendant is currently incarcerated at FCI Waseca with a projected release date of February 16, 2022. (Doc. 79, at 2).

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the United States Sentencing Guidelines ("USSG") discussing compassionate release issued by the United States Sentencing Commission. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

## IV.    DISCUSSION

### A.    *Exhaustion of Administrative Remedies*

Section 3582(c)(1)(A) states the court may reduce a defendant's term of imprisonment after the defendant exhausts all administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  Courts differ as to whether a defendant fulfills the exhaustion requirement after 30 days even if the warden denied the defendant's request within 30 days and the defendant did not administratively appeal the denial.  *Compare*, *United States v. Arthaloney*, No. 8:18CR127, 2020 WL 2571171, at *1 n.1, *2 (D. Neb. May 21, 2020), *with United States v. Ingram*, No. 14-303(2) (DWF/BRT), 2020 WL 3104643, at *2 (D. Minn. June 11, 2020).  This Court has held the plain language of Section 3582(c)(1)(A) does not on its face require a defendant to exhaust administrative appeals "following a denial" or qualify the 30 days provision as only applying after "inaction."  *See Burnside*, 2020 WL 3443944, at *6–7.  Because there is a "strong presumption that the plain language of the statute expresses congressional intent," this Court found defendants are not required to administratively appeal a warden's denial and may fulfill the exhaustion requirement of Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion in the courts.  *Id.* (quoting *Ardestani v. INS*, 502 U.S. 129, 135 (1991)).

On March 29, 2020, defendant submitted her request for release to FCI Waseca's warden.  (Doc. 79–1, at 4).  On May 11, 2020, the warden denied her request.  (*Id.*, at 5).  On May 17, 2020, defendant administratively appealed the warden's denial.  (*Id.*, at 6).  On May 28, 2020, the BOP denied her appeal.  (*Id.*, at 7).  Defendant is currently submitting a regional administrative appeal.  (Doc. 79, at 2–3).  On May 15, 2020, defendant filed a pro se motion for compassionate release in this Court.  (Doc. 74).  On

June 11, 2020, after being appointed counsel (Doc. 75), defendant filed her Motion for Compassionate Release now before the Court (Doc. 78).

Regardless of whether defendant has exhausted every administrative appeal available to her, 30 days elapsed between the time she submitted her request to the warden on March 29, 2020, and the filing of either of her motions here on May 15, 2020, and June 11, 2020, respectively. Thus, the Court finds defendant has fulfilled the exhaustion requirement of Section 3582(c)(1)(A) due to the lapse of 30 days.

### B.     *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because her medical conditions put her at a high risk of severe complications and death if exposed to COVID-19. (Doc. 79, at 5–12). Specifically, defendant cites her age of 67, status as a chronic care inmate, and medical conditions of hepatitis C and liver disease, which defendant alleges compromise her immune system. (*Id.*, at 8). The government argues these conditions are insufficient. (Doc. 81, at 9–17).

Numerous courts have held a defendant's relevant health conditions and the presence of COVID-19 within the BOP generally, or within the defendant's specific facility, together can constitute an extraordinary and compelling reason for compassionate release. *Burnside*, 2020 WL 3443944, at *7 (compiling cases). The Centers for Disease Control ("CDC") lists nine categories of people who are at higher risk of severe illness and death from COVID-19: (1) people 65 years or older, (2) people living in a long-term care facility, (3) people with chronic lung disease or moderate to severe asthma, (4) people with a serious heart condition, (5) people with a compromised immune system, (6) severely obese people with a body mass index ("BMI") of 40 or above, (7) diabetic people, (8) people with chronic kidney disease undergoing dialysis, and (9) people with liver disease. *People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-

risk.html. The latter seven categories apply to "[p]eople of all ages with underlying conditions, particularly if not well controlled[.]" *Id.*

Defendant certainly fits two of the CDC's risk categories as a person over 65, although marginally at age 67, and a person with liver disease due to her hepatitis C diagnosis. She also asserts she fits the category for immunocompromised persons. The record shows defendant received no treatment for hepatitis C until June 2020. (Doc. 81–2, at 1, 8). On April 30, 2019, defendant refused hepatitis C treatment despite being advised of potential health risks. (Doc. 81–1, at 18). At that time, she stated "I just don't want it, I get out in 2 [years] and can do it then." (*Id.*, at 22). On October 15, 2019, defendant explained she was refusing treatment because she thought it would result in a transfer. (*Id.*, at 3). Once she was informed otherwise, she expressed interest in treatment. (*Id.*). After treatment is complete, defendant's "viral load should be undetectable." (Doc. 81–2, at 3, 8). There are no reports about complications defendant has suffered due to hepatitis C or any of her other conditions. No reports in the record mention any liver disease or that she has a compromised immune system. Defendant has consistently reported positive mental health, although she has recently experienced stress about her overall health. *See, e.g.*, (*Id.*, at 8, 15).

The Court finds that although defendant has some health care needs, such needs are not particularly significant and do not warrant release. Defendant had long been advised to undergo hepatitis C treatment and was on the fence about doing so. Prior to accepting treatment, there is no indication she was suffering in any way. Now that she is being treated, her prognosis is very promising. Although her age puts her at a slightly elevated risk, the Court finds such risk insufficient to constitute an extraordinary and compelling reason for release. Further, there are no active cases of COVID-19 at FCI Waseca. *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/. In short, her elevated health risk and her risk of exposure to COVID-19 are not serious.

9

Case 6:08-cr-02015-CJW-MAR   Document 86   Filed 06/25/20   Page 9 of 11

Thus, the Court finds defendant's medical conditions do not warrant release despite the COVID-19 pandemic.

### C. *Section 3553(a) Factors and Danger to Community*

Guideline Section 1B1.13(2) provides compassionate release is appropriate only where "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

The Court need not retread defendant's significant criminal history. The Court has sympathy for defendant's struggles with addiction and mental health and recognizes defendant has completed an impressive amount of education courses, worked, and saved money while incarcerated. (Doc. 79–1, at 14–16). Her proposed release plan also appears promising. (*Id.*, at 4). That said, her drug-driven pattern of criminal conduct is truly relentless. Nothing has stopped this defendant—not probation, not incarceration, not her age. No matter the punishment, defendant has repeatedly burglarized pharmacies, shoplifted from stores, committed various types of fraud, and used extreme violence against innocent people in her obdurate pursuit of controlled substances. Her possession of a firearm here shows she was willing, as she did in the past, to use any means necessary against any person in order to obtain drugs. The Court hopes defendant's current term

10

of incarceration and future term of supervised release will deter this behavior. Indeed, her behavior while incarcerated indicates she may be ready to make a change. The Court cannot find it appropriate, however, to reduce defendant's sentence when faced with such a history of recidivist, violent, and violative conduct.

Weighing all the factors under Section 3553(a), the Court finds compassionate release is inappropriate and therefore **denies** defendant's motion.

### V. CONCLUSION

For these reasons, defendant's Motion for Compassionate Release (Doc. 78) is **denied**.[2] Defendant must serve the remainder of her term of imprisonment as previously directed. (Doc. 50).

**IT IS SO ORDERED** this 25th day of June, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

---

[2] The Court also **denies** defendant's pro se motion for compassionate release (Doc. 74) because it is duplicative of her current motion for compassionate release (Doc. 78).